UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | No. 24-cr-109-01 (DLF) |
| : | |
| LAMONT M. LANGSTON, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons set forth below, the United States respectfully requests that the Court impose a sentence of 188 months' imprisonment, to be followed by five years of supervised release.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

Lamont Langston supervised a significant PCP conspiracy in the District of Columbia, supplying and coordinating the distribution of more than two kilograms of PCP to undercover officers over a four-month period. In the course of and in furtherance of the conspiracy, Langston possessed at least two firearms—a Glock with a machinegun conversion switch, and an AK-style Draco semiautomatic pistol.[1]

**The Defendant and the Undercover Buys**

The Defendant has pleaded guilty to his role in a PCP distribution conspiracy investigated

---

[1] The facts in this section are drawn from the Statement of Offense (ECF No. 47, the "SOF"), discovery produced to the Defendant, and the Draft Presentence Investigation Report (ECF No. 103, the "Draft PSR"). As of June 18, 2025, no final Presentence Investigation Report has been issued.

by the FBI and DEA in 2023 and 2024. Langston procured PCP for the conspiracy from at least November 14, 2023—when he was observed on a pole camera outside co-conspirator Norman Morris's residence with Morris and Jamar Bennett—through late February 2024. The PCP was sold to two undercover officers ("UC-1" and "UC-2") in the District of Columbia. SOF at 4. The PCP sales, which were conducted by the Defendant's co-conspirator Jamar Bennett, occurred between November 2023 and February 2024, on nine occasions, and ranged in quantity from four ounces (approximately 83 grams) to 16 ounces (approximately 330 grams) for a total more than two kilograms of PCP. The Defendant supplied the PCP for at least seven of these sales, if not all of them, totaling at least one kilogram of PCP. SOF at 4. The PCP was sold in water bottles or juice bottles. A chart of the transactions in which the Defendant has admitted his involvement (SOF at 5) is shown below for reference:

| DATE | TIME | UC | BUY AMT | DRUG | AMT (grams) | AMT (oz.) | PRICE PER UNIT |
|---|---|---|---|---|---|---|---|
| 11/28/2023 | 1:34PM | UC-2 | $1,600 | PCP | 150.378 | 8 | $200 per oz |
| 12/19/2023 | 12:11PM | UC-2 | $1,600 | PCP | 167.322 | 8 | $200 per oz |
| 1/11/2024 | 11:43AM | UC-2 | $3,200 | PCP | 333.938 | 16 | $200 per oz |
| 1/22/2024 | 10:59AM | UC-2 | $3,200 | PCP | ~330 | 16 | $200 per oz |
| 1/30/2024 | 12:43PM | UC-2 | $3,200 | PCP | ~330 | 16 | $200 per oz |
| 2/14/2024 | 12:10PM | UC-1 | $3,200 | PCP | ~330 | 16 | $200 per oz |
| 2/29/2024 | 1:00PM | UC-2 | $3,200 | PCP | ~330 | 16 | $200 per oz |
| TOTAL | | | $19,200 | | 1,971.648 | 96 | |

These were wholesale quantities of PCP, intended for redistribution to others.

The Defendant was intimately involved in the sales. The transactions followed a pattern: when the UC placed a phone call to Jamar Bennett to request PCP, Bennett would advise the UC that he had to call "his folks" (i.e., his supplier) to confirm availability of the PCP. Bennett would then call the Defendant, and after making contact with the Defendant would call back the UC to confirm.

For the PCP sales identified in the chart above, the Defendant stored the PCP at the home of co-conspirator Kelvin Sanker, at 3920 Burns Ct. SE, in Washington, DC.  As indicated by video footage from security cameras at Sanker's home, the Defendant had free access to the residence and would enter the house and back yard to prepare PCP for distribution.



*Security camera still showing the Defendant letting himself into stash house at 3920 Burns Ct. SE, carrying a can of starter fluid*



*Security camera still showing the Defendant in the back yard of 3920 Burns Ct. SE, spraying starter fluid into empty bottles*

The Defendant was a direct financial beneficiary of the PCP conspiracy. On at least one occasion, law enforcement witnesses observed co-conspirator Bennett hand cash into Langston's car outside Norman Morris's home in the hours following an undercover PCP purchase.



*Surveillance still, dated Jan. 22, 2024, of Jamar Bennett handing U.S. currency to the Defendant outside 248 58th St. NE (residence of co-conspirator Morris) shortly after a controlled PCP buy*

In addition to being the source of supply, the Defendant acted as an organizer, leader, manager, or supervisor of others in the conspiracy, and he admits that he directed others in the preparation, storage, collection, and distribution of PCP. SOF at 5.

**The Defendant's Arrest**

On February 25, 2024, at approximately 5:45 PM, as captured on a covert surveillance camera, the Defendant parked a white Lexus sedan in the 300 block of 57th St. NE and got into Norman Morris's Mercedes Benz. About 90 minutes later, at 7:15 PM, the Defendant returned in Morris's Mercedes, got out, and stood next to the Lexus, speaking to the driver of a black SUV. As an MPD police cruiser came down the street, the Defendant turned, ran, and discarded a loaded Glock Model 22C .40 caliber handgun with a machinegun conversion device and an extended magazine. The machinegun conversion device allowed the handgun to function as a machinegun, and the Defendant knowingly and willfully possessed it in connection with his drug trafficking.

SOF at 6.

The Defendant fled down an alley, pursued by police, and hid in the Watts Branch creek. He was apprehended approximately 30 minutes later, after an extensive search involving a K9 unit and a police helicopter. Police recovered from the Defendant, the Defendant's coat, and the Lexus sedan: a second firearm (a loaded AK-style, 7.62x39 caliber Century Arms Micro Draco pistol with a 30-round extended magazine); $9,868 in cash; and an 8-ounce water bottle containing PCP, in the same style as those sold by Jamar Bennett to undercover officers. The Defendant admits that this second firearm was also knowingly and willfully possessed in connection with the Defendant's drug trafficking. SOF at 6–7. Police also recovered empty bottles of promethazine with the labels torn off, suspected oxycodone pills, and a package addressed to the Defendant.



*Photograph of items recovered from the Defendant's person, coat, and car after his arrest on February 25, 2024*

The Defendant was prohibited from possessing the two firearms and ammunition because

he had been previously convicted of a felony. Specifically, in 2016, the Defendant was convicted of Assault with a Dangerous Weapon in the Superior Court for the District of Columbia (case number 2016 CF3 9585) and was sentenced to 3 years' confinement. The Defendant knew he had a prior conviction for a crime punishable by more than one year imprisonment. SOF at 7.

### The Defendant's Post-Arrest Obstruction of Justice

Less than 48 hours after the Defendant's arrest, the Defendant began making calls from the jail to his co-conspirators to protect and further the conspiracy. The Defendant called co-conspirator Norman Morris to ask him for help collecting debts from various associates, and also to instruct him to collect four bottles of PCP that were still stored at the 3920 Burns Ct. SE stash house. *See* Exh. A at 5:35. At intake, after his arrest, the Defendant had reported—falsely—that his address was 3920 Burns Ct. SE (the address of co-conspirator Sanker). SOF at 7. As a result, the Defendant knew that authorities were expected to call or visit the location where Langston stored PCP. The Defendant has admitted that at this time he was aware of a criminal investigation and knew that he was asking his co-conspirator to remove evidence in anticipation of a visit from law enforcement. SOF at 7. Morris retrieved the PCP shortly after midnight on February 29, 2024, and Bennett sold two bottles of it to an undercover officer later that day.

On March 2, 2024, Langston called an associate and former girlfriend, Tynisha Dunn, to confirm that evidence would be or had been removed from the stash house. During the call, the Defendant stated, "And, um, y'all I know I used that – Son's, Son's [Kelvin Sanker's] address. So y'all can know to clean. You feel me?" *See* Exh. B at 5:42. Dunn confirmed that Langston's co-conspirator Norman Morris had retrieved the PCP. *Id.* at 6:00. Langston expressed concern in the same call that he may have left a firearm at the same address and discussed with Dunn and Sanker that Sanker had looked for the gun but was unable to find it, leading the Defendant to muse

6

that he may have left it at his house. *Id.* at 7:52.

In the call with Dunn and in other calls, the Defendant also discussed the clean-out of the Defendant's apartment in Maryland, *id.* at 4:27, which was subsequently found to be largely emptied of belongings when law enforcement executed a search warrant there on March 6, 2024.

Additionally, as noted in the Draft PSR, "[a]t the time of his arrest the defendant was unemployed." Draft PSR, ¶ 136. But in a recorded jail call on March 4, 2024, the Defendant discussed calling an associate to ask the associate to report two fictitious jobs for the Defendant. *See* Exh. C at 12:04 ("I need to call Durson, to make it look like I work for a school bus and shit, too, though, like I got two, uh, jobs, a school bus attendant and I got another job."). And, in fact, the Defendant's former counsel made this false representation on the Defendant's behalf in a filing in this Court. *See United States v. Lamont M. Langston*, 24-mj-00073-RMM, ECF No. 6 at 4 ("Mr. Langston works at TFO Towing and Recovery as a tow truck driver for the past two and a half years . . . . He also works at D&J Transportation as a school bus driver and has done so for the past three years.").

Following his initial appearance in Superior Court and a criminal complaint in this Court, the Defendant was charged by indictment on February 29, 2024 (ECF No. 4), and by superseding indictment on April 11, 2024 (ECF No. 17) with:

- Count One: of Conspiracy to Distribute and Possess with Intent to Distribute One Kilogram or More of Phencyclidine, in violation of 21 U.S.C. § 846;
- Count Fifteen: Unlawful Possession with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Phencyclidine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c);
- Count Sixteen: Using, Carrying, and Possessing a Machinegun in Furtherance of a

>    Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(B)(ii); and
>
> - Counts Seventeen and Eighteen: Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

On December 19, 2024, the Defendant pleaded guilty to Count One and Count Seventeen of the Superseding Indictment (ECF No. 17), charging him with Conspiracy to Distribute and Possess with Intent to Distribute One Kilogram or More of Phencyclidine ("PCP") in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(iv) (Count One), and Unlawful Possession of Firearms/Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

## II.     LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;
2) the need for the sentence imposed –
   A) to reflect the serious of the offense, to promote respect for the law, and to

>     provide just punishment for the offense;
>     B) to afford adequate deterrence to criminal conduct;
>     C) to protect the public from further crimes of the defendant; and
>     D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> 3) the kinds of sentences available;
> 4) the kinds of sentence and the sentencing range established for –
>     A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>         i) issued by the Sentencing Commission . . . ; and
>         ii) that . . . are in effect on the date the defendant is sentenced;
> 5) any pertinent policy statement –
>     A) issued by the Sentencing Commission . . . and
>     B) that . . . is in effect on the date the defendant is sentenced
> 6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> 7) the need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007).

### III.    GUIDELINES CALCULATION

The Draft PSR correctly calculates the Defendant's Offense Level (33) and Criminal History Category (II). Draft PSR ¶¶ 62, 69. This calculation is based on the quantity of PCP that was foreseeable to the Defendant in the course of the conspiracy (between 1 and 3 kilograms), the Defendant's possession of a dangerous weapon during the commission of the offense (a Glock converted to a machinegun and a semi-automatic Draco pistol), and the Defendant's obstruction of justice while in an aggravating role. The Defendant further receives an aggravating role enhancement because he was an organizer, leader, manager, or supervisor of others in the conspiracy.

The Government has agreed to recommend and move for a reduction of three total offense levels for the Defendant's timely acceptance of responsibility, reducing the total offense level from 36 to 33. The parties agree that the Defendant is ineligible for a reduction under U.S.S.G. §4C1.1 because he received criminal history points from a prior felony and because he possessed a firearm in the course of the offense.

The Defendant's Criminal History Category is II because the Defendant receives three criminal history points for his 2016 felony conviction for Assault with a Dangerous Weapon.

If the Court accepts the calculations in the Draft PSR, the Defendant's Guidelines range would be 151 to 188 months in prison, followed by a term of at least five years of supervised release. A 10-year mandatory minimum sentence applies to Count One.

## IV.   ARGUMENT

Lamont Langston's criminal conduct was dangerous, sustained, and contemptuous of the law, and it merits a significant sentence of 188 months—at the high end of the Guidelines range for his offenses of conviction but less than half of what this Court would be required to sentence him to had he been convicted at trial on all charges. The Government's request is borne out by the Section 3553(a) factors, discussed below.

### 1.   The Nature, Circumstances, and Seriousness of the Offense

The dangerousness of the Defendant's crimes is self-evident: He supplied thousands of doses of a dangerous and volatile narcotic to a single customer over a four-month period, and he carried a machinegun on the streets of DC to protect his unlawful product and his illicit gains.

The Defendant's PCP trafficking was not incidental or happenstance. His comparatively complex operation—his use of the home of an associate in a residential neighborhood as a stash house, his coordination of multiple co-conspirators in different roles, and the sheer quantity of

PCP he was able to marshal on an as-needed basis (undercover buys were generally organized with one day of notice or less to the co-conspirators) makes clear that the Defendant was directing a sophisticated business.  Security camera footage from the stash house indicates that the DEA and FBI were not the Defendant's only PCP customers, as the Defendant was seen preparing separate, even larger bottles than the ones sold to the undercover officers.[2]  In addition, after co-conspirator Morris retrieved four eight ounce bottles from co-conspirator Sanker's residence, co-conspirator Bennett sold only two of those bottles to undercover law enforcement.  The remaining two bottles were never recovered.

PCP, even in small doses (5 mg to 10 mg) "may induce acute schizophrenia, including agitation, psychosis, audiovisual hallucinations, paranoid delusions, and catatonia.  Doses greater than 10 mg usually result in coma." Bey T. & Patel A., *Phencyclidine Intoxication and Adverse Effects: A Clinical and Pharmacological Review of an Illicit Drug*, Cal. J. Emerg Med. 2007 Feb;8(1):9-14, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC2859735/.  The Defendant supplied PCP sufficient for hundreds if not thousands of coma-inducing doses of PCP.

The Defendant should win no credit with the Court because he did not kill or injure anyone in this case.  On a Sunday night in February, the Defendant was carrying a loaded machinegun with a 22-round extended magazine on his person as he stood on the streets of Washington, DC.  Steps away, in his car, he kept a second gun—an AK-style semiautomatic pistol—in the trunk, also loaded, also with an extended magazine; and a bottle of PCP in the driver-side door.  These weapons were not for decoration.  The Defendant knew how to use them and kept them to further his drug trafficking.  Had the Defendant been convicted of Count Sixteen, Use of a Machinegun

---

[2] During a recorded call between Jamar Bennett and an undercover officer a few weeks before his arrest, Bennett stated that his source of supply for PCP (i.e., the Defendant) was also his source of supply for fentanyl.  The Defendant has not been charged with any offenses related to fentanyl.

11

in Furtherance of a Drug Trafficking Offense, he would face a mandatory 30-year sentence, to run *consecutively* to the 10-year mandatory sentence for his PCP conspiracy. Although the Defendant pleaded guilty to the lesser offense under 18 U.S.C. § 922(g), the significant mandatory sentence that applies to essentially the same conduct underscores the seriousness with which Congress takes the use of drugs and guns, and the recklessness of the Defendant's behavior. That he possessed any firearms after being convicted of a violent felony is reprehensible; that he recklessly threw the loaded machinegun to the ground when encountering the police is even more alarming.

The Defendant's contempt for the law was further displayed when after his arrest he continued to coordinate the PCP conspiracy from behind bars. He instructed his co-conspirators to clean out the stash house and his apartment before law enforcement arrived, including asking Kelvin Sanker to find the "toy" (firearm) the Defendant kept at Sanker's house to give to the Defendant's associate Tynisha Dunn. That Sanker was unable to find the gun in his home suggests, if anything, even more extreme recklessness—it is one thing to keep a gun at the stash house where you store your narcotics; it is another thing entirely to *forget where you left your guns*. The nature of the Defendant's conduct demands a lengthy sentence.

### 2. The Defendant's History and Characteristics

The Defendant's criminal history, which under U.S.S.G. §4A1.2 includes a felony conviction for Assault with a Dangerous Weapon, undercounts the depth and breadth of his encounters with the law. Not to say that this prior conviction is minor: As related in the Draft PSR, in January 2016 at a carryout restaurant at 4:00 AM, two strangers bumped into the Defendant. The Defendant responded by following them in his car (after collecting his food) and shooting at their car while stopped at a red light. Draft PSR, ¶ 68. One person was hit in the ankle. The Defendant was 35 years old at the time.

That was not the Defendant's first conviction. One year earlier, at age 34, he was convicted of fleeing the police. *Id.* ¶ 67. In 2005, while being followed by the police for speeding, the Defendant threw a Beretta handgun from his car and fled on foot. The handgun was loaded with ammunition; the car was loaded with drugs. Prior to that conviction from his mid-20s, the Defendant had two other drug convictions. *Id.* ¶¶ 63–64.

Those are just the convictions. Separate from those offenses, between age 19 and age 30, the Defendant was arrested 13 times. *Id.* ¶¶ 71–83, 85. Nine of those arrests were drug-related, including two with suspected PCP. Two of the drug-related arrests involved co-conspirator Jamar Bennett. *Id.* ¶¶ 77, 85. In two of the arrests—again, separate from the convictions—the Defendant tried to run from the police. *Id.* ¶¶ 72, 77.

A dangerous pattern emerges: The Defendant is a committed drug dealer, with access to numerous drugs, including PCP. He also uses firearms to protect and further his drug trafficking, and when confronted by law enforcement he flees and he tosses his weapons. He keeps doing it even after being caught again, and again, and again.

This pattern must stop. The Court should hand down a substantial sentence.

### 3. The Need to Promote Respect for the Law and Deterrence

The Defendant's pattern of drug dealing and gun toting should not be tolerated, nor should his efforts to obstruct law enforcement and this Court. The Defendant has no respect for the law, as indicated by his career selling narcotics and running from the police. He has no respect for law enforcement, as evidenced by his directives to dispose of evidence of his crimes. It also seems he has no respect for the Court, as he blatantly lied to Pretrial Services upon arrest about his address, and then fed the Court lies through his former lawyer about fictitious jobs to try to win release on bond. This is the behavior of a man who believes that rules are obstacles to be avoided.

13

A 188-month sentence is appropriate to promote respect for the law and deterrence. Prior sentences and dispositions have been insufficient to deter the Defendant from trafficking narcotics and possessing firearms, indicating that a stiffer penalty is required.

4. **Other Factors**

The Government believes that Lamont Langston deserves a longer sentence than the two co-conspirators who have been previously sentenced in this case. Jamar Bennett was sentenced to 121 months; Kelvin Sanker was sentenced to 65 months. These sentences reflected those defendants' roles in the conspiracy as the frontman making sales (Bennett) and the manager of the stash house (Sanker). Mr. Bennett's lower sentence also reflected his lack of involvement in the obstructive conduct in the case and the sincerity of his allocution at sentencing. Mr. Sanker's reflected his much lighter and non-violent criminal history.

The Defendant now before the Court has none of these mitigating factors. He was in a more senior role, used more firearms in closer connection with the drug offenses, and directed the obstruction. This is an instance where a sentence at the low end of the Guidelines range, or even the mid-point of the Guidelines range, would undercount the Defendant's criminal responsibility.

The Draft PSR reflects that the Defendant has a long-standing substance abuse problem which may benefit from treatment and counseling during incarceration—although the Government does not believe that the Defendant's behavior is in any way mitigated by his substance abuse. Draft PSR, ¶¶ 122–25. A sustained period of incarceration would also give the Defendant an opportunity to take courses and develop job skills that could help him earn a living upon release.

V. **CONCLUSION**

The Defendant's trafficking in massive quantities of PCP, his reckless behavior while armed, and his efforts to conceal and to continue the conspiracy even after his own arrest

demonstrate the need for a 188-month sentence, to be followed by five years of supervised release. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

                              Respectfully Submitted,

                              JEANINE FERRIS PIRRO
                              United States Attorney

By:    /s/ Adam L.D. Stempel
         Adam L.D. Stempel
         Special Assistant United States Attorney
         Peter V. Roman
         Assistant United States Attorney